UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

TYRONE GEARLES,

                                        Plaintiff,

                    -against-

THE CITY OF NEW YORK, DETECTIVE ANTONIO
EDWARDS, SERGEANT ANTHONY BORELLI,
DETECTIVE JOSEPH PINDER, DETECTIVE ARTIMIO
VEGA, DETECTIVE ROBERT BERNHARD,
SERGEANT FREDDY DOMINGUEZ, DETECTIVE
JOSE DELROSARIO, DETECTIVE SID CAESAR,
DETECTIVE BETSY FRATICELLI, DETECTIVE
THOMAS MCCALL, UNDER COVER POLICE
OFFICER C0064, UNDER COVER POLICE OFFICER
0206, and UNDER COVER POLICE OFFICER 0069

                                        Defendants.

-------------------------------------------------------------------------x

FIRST AMENDED COMPLAINT

13 Civ. 4495 (CM) (JLC)

JURY TRIAL DEMANDED



## NATURE OF THE ACTION

1.      This is an action to recover money damages arising out of the violation of

Plaintiff's rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth,

Fifth, and Fourteenth Amendments to the Constitution of the United States.

3.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and

1367(a).

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5.     Plaintiff demands a trial by jury in this action.

## PARTIES

6.     Plaintiff Tyrone Gearles ("Plaintiff" or "Mr. Gearles"), an African-American male, is a resident of the County of New York, City of New York.

7.     On the date of the incident complained of, infra, Mr. Gearles suffered from and was being treated for non-Hodgkin lymphoma, high blood pressure, asthma, and problems sleeping.

8.     Defendant The City of New York is a municipal organization organized under the laws of the State of New York.

9.     Defendant The City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant The City of New York.

10.    The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

11.    At all times relevant herein, Defendant Detective Antonio Edwards ("Edwards") was an officer, employee, and agent of Defendant The City of New York.

12.    At all times relevant herein, Defendant Edwards was acting within the scope of his employment with Defendant The City of New York.

13.    At all times relevant herein, Defendant Edwards was acting under color of state law.

14.    Defendant Edwards is sued in his individual and official capacities.

15.   At all times relevant herein, Defendant Sergeant Anthony Borelli ("Borelli") was an officer, employee, and agent of Defendant The City of New York.

16.   At all times relevant herein, Defendant Borelli was acting within the scope of his employment with Defendant The City of New York.

17.   At all times relevant herein, Defendant Borelli was acting under color of state law.

18.   Defendant Borelli is sued in his individual and official capacities.

19.   At all times relevant herein, Defendant Detective Joseph Pinder ("Pinder") was an officer, employee, and agent of Defendant The City of New York.

20.   At all times relevant herein, Defendant Pinder was acting within the scope of his employment with Defendant The City of New York.

21.   At all times relevant herein, Defendant Pinder was acting under color of state law.

22.   Defendant Pinder is sued in his individual and official capacities.

23.   At all times relevant herein, Defendant Detective Artimio Vega ("Vega") was an officer, employee, and agent of Defendant The City of New York.

24.   At all times relevant herein, Defendant Vega was acting within the scope of his employment with Defendant The City of New York.

25.   At all times relevant herein, Defendant Vega was acting under color of state law.

26.   Defendant Vega is sued in his individual and official capacities.

27.   At all times relevant herein, Defendant Detective Robert Bernhard ("Bernhard") was an officer, employee, and agent of Defendant The City of New York.

28.     At all times relevant herein, Defendant Bernhard was acting within the scope of his employment with Defendant The City of New York.

29.     At all times relevant herein, Defendant Bernhard was acting under color of state law.

30.     Defendant Bernhard is sued in his individual and official capacities.

31.     At all times relevant herein, Defendant Sergeant Freddy Dominguez ("Dominguez") was an officer, employee, and agent of Defendant The City of New York.

32.     At all times relevant herein, Defendant Dominguez was acting within the scope of his employment with Defendant The City of New York.

33.     At all times relevant herein, Defendant Dominguez was acting under color of state law.

34.     Defendant Dominguez is sued in his individual and official capacities.

35.     At all times relevant herein, Defendant Detective Jose Delrosario ("Delrosario") was an officer, employee, and agent of Defendant The City of New York.

36.     At all times relevant herein, Defendant Delrosario was acting within the scope of his employment with Defendant The City of New York.

37.     At all times relevant herein, Defendant Delrosario was acting under color of state law.

38.     Defendant Delrosario is sued in his individual and official capacities.

39.     At all times relevant herein, Defendant Detective Sid Caesar ("Caesar") was an officer, employee, and agent of Defendant The City of New York.

40.     At all times relevant herein, Defendant Caesar was acting within the scope of his employment with Defendant The City of New York.

41.     At all times relevant herein, Defendant Caesar was acting under color of state law.

42.     Defendant Caesar is sued in his individual and official capacities.

43.     At all times relevant herein, Defendant Detective Betsy Fraticelli ("Fraticelli") was an officer, employee, and agent of Defendant The City of New York.

44.     At all times relevant herein, Defendant Fraticelli was acting within the scope of his employment with Defendant The City of New York.

45.     At all times relevant herein, Defendant Fraticelli was acting under color of state law.

46.     Defendant Fraticelli is sued in his individual and official capacities.

47.     At all times relevant herein, Defendant Detective Thomas McCall ("McCall") was an officer, employee, and agent of Defendant The City of New York.

48.     At all times relevant herein, Defendant McCall was acting within the scope of his employment with Defendant The City of New York.

49.     At all times relevant herein, Defendant McCall was acting under color of state law.

50.     Defendant McCall is sued in his individual and official capacities.

51.     At all times relevant herein, Defendant Under Cover Police Officer C0064 ("UC C0064") was an officer, employee, and agent of Defendant The City of New York.

52.     At all times relevant herein, Defendant UC C0064 was acting within the scope of his employment with Defendant The City of New York.

53.     At all times relevant herein, Defendant UC C0064 was acting under color of state law.

54.     Defendant UC C0064 is sued in his individual and official capacities.

55.     At all times relevant herein, Defendant Under Cover Police Officer 0206 ("UC 0206") was an officer, employee, and agent of Defendant The City of New York.

56.     At all times relevant herein, Defendant UC 0206 was acting within the scope of his employment with Defendant The City of New York.

57.     At all times relevant herein, Defendant UC 0206 was acting under color of state law.

58.     Defendant UC 0206 is sued in his individual and official capacities.

59.     At all times relevant herein, Defendant Under Cover Police Officer 0069 ("UC 0069") was an officer, employee, and agent of Defendant The City of New York.

60.     At all times relevant herein, Defendant UC 0069 was acting within the scope of his employment with Defendant The City of New York.

61.     At all times relevant herein, Defendant UC 0069 was acting under color of state law.

62.     Defendant UC 0069 is sued in his individual and official capacities.

## STATEMENT OF FACTS

63.     On September 17, 2010, Mr. Gearles was lawfully present at or near East 124th Street and its intersection with 5th Avenue in the City, County, and State of New York ("Subject Location").

64.     Specifically, Mr. Gearles was just inside of the park known as Marcus Garvey Park (a.k.a. "Mt. Morris Park" or "Morris Park") speaking with some friends with no criminality afoot.

65.     Suddenly, a police van and radio-motor patrol vehicle drove into the park and stopped near Mr. Gearles and his friends.

66.     The individual defendants approached Mr. Gearles and his friends.

67.     The individual defendants proceeded to frisk Mr. Gearles and his friends without any probable cause or reasonable suspicion.

68.     No contraband was found on Mr. Gearles' person.

69.     The individual defendants told Mr. Gearles that he was being placed under arrest for selling marijuana.

70.     Mr. Gearles denied having done so, and indicated to the individual defendants that all he had on his person was sixty cents.

71.     The individual defendants placed Mr. Gearles under arrest.

72.     Mr. Gearles's arrest was without probable cause.

73.     Upon information and belief, Mr. Gearles's arrest was approved at the Subject Location by the individual defendant who was the supervising officer.

74.     Mr. Gearles was transported to a police precinct.

75.     Upon entering the police precinct, Mr. Gearles was strip and body-cavity searched by the individual defendants.

76.     Mr. Gearles had no contraband on his person, and Mr. Gearles had done nothing to give the individual defendants reasonable suspicion or probable cause to conduct the strip and body-cavity searches.

77.     The strip and body cavity searches were approved and authorized by Defendant Borelli.

78.     At the precinct, Mr. Gearles told the individual defendants that he required medication and medical attention for his blood pressure, asthma, and sleeping disorder.

79.     Despite Mr. Gearles' request for medical attention and medication related to his ailments, his requests were ignored by the individual defendants.

80.     At some point, Mr. Gearles was transferred to the New York County Central Booking.

81.     At New York County Central Booking, Mr. Gearles again requested that the individual defendants provide him with the aforementioned medical attention and medication.

82.     The individual defendants again ignored Mr. Gearles' requests.

83.     The individual defendants spoke with the New York County District Attorneys' Office, individually and collectively lying to the New York County District Attorney's Office that Mr. Gearles had violated New York Penal Law §§ 221.40.

84.     Based on these fabricated allegations, the New York County District Attorney's Office forwarded to Defendant Edwards a Criminal Court Complaint.

85.     The Criminal Court Complaint was reviewed and then signed by Defendant Edwards.

86.     When reviewing and signing the Criminal Court Complaint, Defendant Edwards knew the allegations contained therein to be false.

87.     The executed Criminal Court Complaint was then forwarded by Defendant Edwards to the New York County District Attorney's Office.

88.     The New York County District Attorney's Office forwarded to Defendant UC C0064 a copy of Defendant Edwards' Criminal Court Complaint along with a Supporting Deposition.

89.     Defendant Edwards' Criminal Court Complaint was reviewed by Defendant UC C0064.

90.     When reviewing Defendant Edwards' Criminal Court Complaint, Defendant UC C0064 knew the allegations contained therein to be false.

91.     The Supporting Deposition was reviewed and then signed by Defendant UC C0064.

92.     When reviewing and signing the Supporting Deposition, Defendant UC C0064 knew the allegations and contents contained therein to be false.

93.     Legal process was issued against Mr. Gearles, and Mr. Gearles was subsequently arraigned.

94.     During the pendency of the criminal proceeding, the individual defendants forwarded false evidence to the New York County District Attorney's Office, *inter alia*, arrest reports, complaint reports, criminal complaints, supporting depositions, and property vouchers.

95.     Mr. Gearles suffered damage as a result of Defendants' actions.  Mr. Gearles was deprived of liberty, suffered emotional distress, physical injury, mental anguish, fear, pain, anxiety, embarrassment, humiliation, and damage to reputation.

## FIRST CAUSE OF ACTION
### *42 U.S.C. § 1983*

96.     Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

97.     Defendants, by their conduct toward Mr. Gearles as alleged herein, violated Mr. Gearles' rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

98.     As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

## SECOND CAUSE OF ACTION
### *Unlawful Stop and Search*

99.     Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

100.    The individual defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Gearles without reasonable suspicion.

101.    As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

### THIRD CAUSE OF ACTION
#### *False Arrest*

102.   Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

103.   The individual defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Gearles without probable cause.

104.   As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

### FOURTH CAUSE OF ACTION
#### *Excessive Force*

105.   Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

106.   The individual defendants violated the Fourth and Fourteenth Amendments because they used unreasonable force on Mr. Gearles.

107.   As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

### FIFTH CAUSE OF ACTION
#### *Denial of Substantive Due Process*

108.   Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

109.   The individual defendants created false evidence against Mr. Gearles.

110.   The individual defendants forwarded false evidence to prosecutors in the New York County District Attorney's Office.

111.    In creating false evidence against Mr. Gearles, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Gearles's right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

112.    As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

## SIXTH CAUSE OF ACTION
### *Malicious Abuse of Process*

113.    Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

114.    The individual defendants issued and/or caused to be issued legal process to place Mr. Gearles under arrest.

115.    The individual defendants arrested Mr. Gearles in order to obtain collateral objectives outside the legitimate ends of the legal process, *inter alia*, to cover up their unlawful stop and search of him; their prejudice against persons who are African American; their pursuit of quotas and overtime pay; and to cover up Defendant The City of New York's pattern and practice of racial profiling.

116.    The individual defendants pursued these collateral objectives after issuance of legal process by, *inter alia*, forwarding false evidence to the New York County District Attorney's Office and continuing to participate in the prosecution of Mr. Gearles.

117.    The individual defendants acted with intent to do harm to Mr. Gearles without excuse or justification.

118.     As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

## SEVENTH CAUSE OF ACTION
### *Malicious Prosecution*

119.     Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

120.     The individual defendants initiated the criminal proceedings against Mr. Gearles by issuing and/or causing to be issued legal process against Mr. Gearles.

121.     The individual efendants lacked probable cause to commence the criminal proceedings against Mr. Gearles.

122.     The individual defendants' actions were motivated by actual malice.

123.     The criminal proceeding was terminated in Mr. Gearles' favor.

124.     As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

## EIGHTH CAUSE OF ACTION
### *Failure to Intervene*

125.     Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

126.     Those individual defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

127.     Accordingly, the individual defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

128.    As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

## NINTH CAUSE OF ACTION
### *Conspiracy under 42 U.S.C. § 1983*

129.    Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

130.    The individual defendants jointly participated, along with members of the New York County District Attorney's Office, in the deprivation of Mr. Gearles's constitutional rights as set forth herein.

131.    The individual defendants conspired in the deprivation of Mr. Gearles's constitutional rights by collectively lying about Mr. Gearles's actions and conduct, and intentionally withholding and/or destroying exculpatory evidence in order to support the individual defendants' fabricated version of the events.

132.    As a result of the individual defendants' malicious efforts to damage Mr. Gearles, Mr. Gearles' liberty was restricted, and Mr. Gearles was restrained, subjected to handcuffing, and, among other things, falsely arrested, strip searched, and prosecuted.

133.    As a direct and proximate result of this unlawful conduct, Mr. Gearles sustained the damages herein alleged.

## TENTH CAUSE OF ACTION
### *Section 12132 of the Americans with Disabilities Act of 1990, As Amended ("ADA")*

134.    Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

135.    Mr. Gearles suffers from non-Hodgkin lymphoma, a sleeping disorder, high blood pressure, and asthma.  It is a condition that prevents Mr. Gearles from taking part in many every day activities including running, exercising, working, etc.  Accordingly, Mr. Gearles qualifies as a person with an impairment that substantially limits one or more of major life activities.  Mr. Gearles's condition therefore constitutes a protected disability under the ADA.

136.    The above-described conduct amounts to discrimination against Mr. Gearles as it violates Section 12132, which states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

137.    Pursuant to Section 12121, Defendant The City of New York is a "public entity" subject to the provisions of the ADA.

138.    Defendant The City of New York's, through its employees and agents, intentional or otherwise deliberate refusal to accommodate Mr. Gearles's needs, in light of their knowledge of Mr. Gearles's physical conditions, violated the ADA.

139.    Instead of accommodating Mr. Gearles's needs, Defendant The City of New York, through its employees and agents, denied Mr. Gearles services and programs available to others that could have prevented this miscarriage of justice, as well as Mr. Gearles's pain and suffering.

140.    The failure to accommodate Mr. Gearles's disabilities was intentional and/or deliberately indifferent to Mr. Gearles's rights under Chapter 126 of the ADA and was the proximate cause of their injuries.

141.    As a consequence of Defendant The City of New York's discriminatory treatment and lack of accommodation, Mr. Gearles suffered serious injuries. Mr. Gearles is, thus, entitled to damages.

## ELEVENTH CAUSE OF ACTION
### *§ 504 of the Rehabilitation Act*

142.    Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

143.    Mr. Gearles qualifies as a person with an impairment that substantially limits one or more major life activities. Mr. Gearles's disability, therefore, constitutes a protected disability under the Rehabilitation Act.

144.    Defendant The City of New York's intentional refusal to accommodate Mr. Gearles' physical condition was tantamount to a denial of services and programs available to others that could have prevented this miscarriage of justice, as well as Mr. Gearles' pain and suffering.    The failure to accommodate the foregoing disabilities was intentional and/or deliberately indifferent to Mr. Gearles's rights under § 504 of the Rehabilitation Act, and bore a causal link to Mr. Gearles's subsequent injuries.

145.    As a consequence of Defendant The City of New York's discriminatory treatment and lack of accommodation, Mr. Gearles suffered serious injuries and is entitled to damages.

## TWELFTH CAUSE OF ACTION
### *Equal Protection Clause under 42 U.S.C. § 1983*

146.    Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

147.     The Defendants' conduct was tantamount to discrimination against Mr. Gearles based on his disabilities and ethnicity. This disparate treatment caused Mr. Gearles to suffer serious injuries.

148.     The NYPD discriminatory program is pervasive and evident throughout many of its practices, including those used to stop, question, frisk, and arrest Mr. Gearles.

149.     The NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

150.     One such program is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings. Many buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime. Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

151.     The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City population. Blacks and Latinos were 6 times more likely to be stopped by police than Whites, Asians, and Native Americans combined.

152.     The NYPD has also maintained illegal stop and frisk policies, as part of a systematic discriminatory program aimed towards minorities.

153.   The New York State Attorney General's 1999 inquiry into the NYPD's stop and frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers indicated consistent and significant racial skewing.

154.   According to the report, Blacks comprised 25.6% of the City's population, yet 50.6% of all persons stopped were Black.  Hispanics comprised 23.7% of the City's population yet, 33.0% of all stops were of Hispanics.  By contrast, Whites made up 43.4% of the City's population, but accounted for only 12.9% of all stops.  The disparities were further pronounced in precincts where the majority of the population was White. Where Blacks and Hispanics each represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of stops during any given period. The New York State Attorney General's finding was that 8 out of 9 searches did not uncover contraband.

155.   Under the NYPD's policy, if a person is stopped and questioned without official use of force (or with consent) and gives his or her name, documentation is not required. Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop and frisk searches.

156.   Many experts believe the numbers available from NYPD offices do not accurately reflect the discrimination of the NYPD's stop and frisk program. In one independent street interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

157.   The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

158.    The NYPD frequently uses marijuana arrest cases to bolster both its productivity and arrest reports. Marijuana possession is an infraction payable by fine in New York City, yet from 1997 to 2006, 52% Blacks, 31% Hispanics were arrested for possession of marijuana, as compared to 15% of Whites.

159.    Despite the overwhelming evidence from U.S. government surveys that have consistently shown young Whites between the ages of 18 and 25 using marijuana at higher rates than either young Hispanics and Blacks, in 2006, the marijuana arrest rate of Blacks was five times that of Whites. The arrest rate of Hispanics in 2006 was nearly three times that of Whites.

160.    Arrest records consistently show that where minorities represent a small portion of the population, they also represent the majority of arrestees (with the exception of Staten Island). In Staten Island, Blacks were about 10% of the population, but were 37% of marijuana arrestees. In Manhattan, Blacks were about 17% of the population, but accounted for 43% of marijuana arrestees. In Queens, Blacks were about 20% of the population, but accounted for 57% of marijuana arrestees. In Brooklyn, Blacks were about 36% of the population, but were an overwhelming 65% of marijuana arrestees. Finally, in the Bronx, Blacks were 36% of the population, but accounted for 48% of marijuana arrestees. The White population and the White percentage of marijuana arrestees in each borough were equally skewed, but in the opposite direction.

161.    Trespassing and marijuana arrests are the most effective means available for obtaining fingerprints, photographs, and DNA samples (since 2006) from people never before entered in the criminal justice databases. Where those trespassing and marijuana stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental. Often times,

young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest. Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

162. In fact, Defendant The City of New York is estopped from asserting that such discrimination and tactics do not occur. In Floyd, et al. v. The City of New York, 08 Civ. 1034 (SAS) (S.D.N.Y. Aug. 12, 2013), the Court found that "[t]he NYPD's practice of making stops that lack individualized suspicion has been so pervasive and persistent as to become not only part of the NYPD's standard operating procedure, but a fact of daily life in some New York City neighborhoods." See Floyd, Docket Entry No. 373 at p. 180.

163. The Court goes on to find that Defendant The City of New York, in fact, has a policy of indirect racial profiling, and that senior officials of Defendant The City of New York have been deliberately indifferent to the tactics used by NYPD's members. See id. at p. 181.

164. As a result of the foregoing, Mr. Gearles was deprived of rights under the Equal Protection Clause of the Constitution of the United States, and are thereby entitled to damages.

## THIRTEENTH CAUSE OF ACTION
### *Monell*

165. Mr. Gearles repeats and realleges each and every allegation as if fully set forth herein.

166.   This is not an isolated incident. Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Mr. Gearles.

167.   Defendant The City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

168.   Defendant The City of New York, through the NYPD, has a *de facto* quota policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

169.   This quota policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

170.   Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

171.   Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

172.   Active officers are given promotion opportunities that are not afforded to inactive officers.

173.   Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

174.   The quota policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

175.   Defendant The City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully.  There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

176.   Defendant The City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to proper counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

177.   The failure of Defendant The City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

178.   Defendant The City of New York is estopped from asserting that a quota/productivity policy does not exist and that this policy motivates police officers to violate the rights of individuals.  See Bryant v. The City of New York, 022011/2007 (Kings Cnty. Sup. Ct.) (jury finding that quota policy exists and that it contributed to constitutional rights violations).

179.   Defendant The City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

180.   Defendant The City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

181.   Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

182.   These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

183.   Defendant The City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

184.   As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

185.   Defendant The City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

186.   Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

187.   These policies, practices, and customs were the moving force behind Mr. Gearles's injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Gearles respectfully requests judgment against Defendants as

follows:

(a)     Compensatory damages against all defendants, jointly and severally;

(b)     Punitive damages against the individual defendants, jointly and severally;

(c)     Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d)     Such other and further relief as this Court deems just and proper.

Dated: New York, New York
        August 9, 2013

Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
Attorney for Plaintiff
305 Broadway, 14th Floor
New York, NY 10007
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com